UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARTIN J. WALSH, Secretary of
Labor, United States Department of Labor,

      Plaintiff,

v.

INDEPENDENT HOME
CARE OF MICHIGAN, LLC,
KATHRYN FLICK, an individual, and
MARY CLARK, an individual,

      Defendants.

_____/

Case No. 20-10170
Honorable Victoria A. Roberts

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I.  INTRODUCTION

The Department of Labor ("DOL") brought this action against Independent Home Care ("IHC") and its owners – Mary Clark and Kathryn Flick – for alleged violations of the Fair Labor Standards Act's ("FLSA") overtime rules, 29 U.S.C. §§ 201 *et seq*.  The DOL claims that Defendants must pay their employees back pay and liquidated damages for overtime hours they worked.

1

Defendants filed a motion for summary judgment arguing that they are not liable for either.  They said the Portal-to-Portal Act, 29 U.S.C. § 259 (1994) ("PPA"), provides them an affirmative defense because they acted "in good faith conformity with and in reliance" on the previous DOL regulation, 29 C.F.R. § 552.109 (1975), which exempted them from paying companionship employees overtime.  [ECF No. 20].

Defendants argued that if the Court did find them liable for back wages, it should not award liquidated damages because they acted in good faith and on reasonable grounds to believe they were not violating the FLSA.  *Id*.

On July 20, 2021, the Court issued an order denying Defendants' summary judgment motion.  In its ruling, the Court found genuine issues of fact as to whether Defendants' conduct demonstrated good faith and reasonableness.  [ECF No. 26].

The Defendants concede they violated statutory overtime requirements and are required to pay the  employees affected back wages. But they dispute liability for liquidated damages.

The Court conducted a bench trial on May 9, 2022 through May 10, 2022.  Kathryn Flick, Mary Clark, Daniel Murphy, Danis Russel, Sherrie Keen, Robyn Tucker, Danielle Graves, and Timolin Mitchell testified at trial.

Four issues were before the Court for trial: (1) whether IHC owes back wages (IHC concedes); (2) whether IHC took affirmative steps to ascertain the overtime requirements of the FLSA; (3) whether IHC acted reasonably in failing to pay overtime wages; and (4) whether Defendants violated the FLSA recordkeeping provisions.

These are the Court's findings of fact and conclusions of law. Judgment will enter in favor of the DOL in the amount of $93,331.20, together with costs, interest, and attorney fees.

## II.  FINDINGS OF FACT

### A. IHC Formation and Owners' Duties

1. In 1998 or 1999, prior to forming IHC, Clark asked a DOL representative whether companionship service employees are entitled to overtime pay.  The DOL representative told her that they were not because of a FLSA companionship service exemption.

2. Clark founded IHC on approximately July 1, 2000.  She remains a co-owner.

3. Flick, Clark's daughter, joined IHC after its formation and is co-owner of the company.

4. IHC was, and continues to be, engaged in the business of providing companionship services. (Stipulated Fact ("SF") 2).

5. IHC's employees provide home care services in domestic households for disabled individuals. (SF 4).

6. IHC is a qualifying enterprise and employer under the FLSA. (SF 5).

7. Clark is a nurse. Her duties include providing health care training to IHC staff. (SF 15).

8. Flick is an accountant and is primarily responsible for the financial side of IHC's business. She pays its bills; manages its payroll to ensure compliance with federal and state Medicaid requirements; and invoices Genesee Health Systems (GHS). (SF 5).

**B. FLSA Overtime Rules Before 2013**

9. Before October 1, 2013, Congress created exemptions from the FLSA's overtime requirements for workers providing companionship services. 29 U.S.C. §§ 213(a)(15), 213(b)(21). The regulations allowed third-party providers of home care workers to claim these exemptions. 29 C.F.R. § 552.109. Accordingly,

employers, such as IHC, were not required to pay employees providing companionship services an overtime rate.  (SF 24).

10.    When Clark formed IHC, she was not required to pay employees time and one-half ("premium pay") for hours worked in excess of 40 per week.

### C. **FLSA Overtime Rules After 2013**

11.    The Home Care Final Rule ("2013 Rule") amended the 1975 regulations regarding domestic service employment.   The DOL published the new regulations on October 1, 2013.  78 FR 60454.  (SF 22).

12.    The DOL publicized this FLSA change on its website.  (JTE 1-15).

13.    The 2013 Rule precludes third-party providers, such as home care staffing agencies, from claiming overtime exemptions.   It requires them to pay employees premium pay for overtime.  (SF 25).

14.    The 2013 Rule went into effect on January 1, 2015.  (SF 23).

15.    Pursuant to the 2013 Rule effective January 1, 2015, Defendants were required to pay the following employees premium pay

because they worked more than 40 hours per week: Lynn Allard, Miranda Boulton, Zarvacia Brooks, Marcades Dixon, Dominique Fischer, Yolanda Giles, Sherrie Keen, Contrina Kelley, Amy Knapp, Rebecca Lang, Saige McLain, Savannah Miller, Kalecia Morgan, Shawn Murray-Laursen, Melissa Pinter, Heather Rose, Antoinette Scandrick, Angelita Sims, Sharon Skinner, Connie Smith, Sarah Thomas, Robyn Tucker, Steve Weir.  (SF 26).

## D. **GHS and IHC Relationship**

16.    IHC receives its home care clients through a contract with GHS.

17.    GHS is a public funded community mental health service ("CMHS") in Genesee County.  It receives 93%-95% of its funds from state and federal Medicaid.  The remainder of its funding comes from other state sources and private donors.

18.    GHS serves the severely mentally ill, seriously emotionally disturbed, intellectually and developmentally disabled, and individuals with substance use disorders.

19.    GHS conducts a Medicaid screen of prospective clients to ensure they are eligible.

6

20.    If the individual is found to be eligible based on Medicaid criteria, GHS contracts with third-party companionship providers, such as IHC, to provide services.

21.    GHS pays IHC a rate set by contract based on the services IHC provides to clients.

22.    IHC provides three types of services to clients – CLS (community living support), respite, and respite modifier.  Each of these services are billed at a different hourly rate.

23.    GHS pays the "respite modifier" rate when an employee cares for two clients at the same time.

24.    Flick negotiated and signed contracts on behalf of IHC.

25.    The contract between GHS and IHC requires IHC to know and comply with all applicable labor and employment laws.

26.    Generally, if providers have questions about Medicaid laws, GHS directs the provider to the state Medicaid manual.

27.    GHS has policies and procedures which prohibit its staff from giving legal advice to third-party providers and from telling them how to run their businesses.  If a provider requested such advice, GHS would advise it to contact an attorney.

7

28.   As a courtesy, GHS sometimes emails its providers updates about changes in billing rates and state minimum wage requirements.   GHS does not provide updates on any other changes in the law.

29.   Flick had approximately 10 email conversations with GHS representatives about changes in billing rates and minimum wages but not premium pay requirements.

30.   GHS does not reimburse providers such as IHC for overtime pay because Medicaid does not reimburse GHS.   If IHC paid its employees overtime wages, it would be required to pay the overtime wages from its own margin.

**E.  DOL Investigation**

31.   IHC employee, Sherry Keen ("Keen"), began working for IHC in 2014 as a caregiver.   She often worked more than 40 hours per week, but never received premium pay for overtime.

32.   Keen heard from friends that labor laws may have changed or were changing due to the election of Donald Trump as President.

33.   Sometime around June 2017, Keen asked Clark why IHC employees did not receive premium pay for overtime.   Clark

8

responded by saying that IHC is exempt from paying overtime because it is a companionship service provider.  Clark also told Keen that GHS does not reimburse for overtime so IHC cannot pay its staff overtime.

34.    A few months after the conversation with Clark, Keen asked Flick the same question.  Flick gave the same response that Clark gave.

35.    Following her conversation with Flick, Keen researched the DOL website for a phone number to inquire about premium pay for overtime.

36.    In May of 2019, Keen contacted DOL Wage and Hour Investigator, Daniel Murphy ("Murphy"), and asked him if she was entitled to overtime.

37.    Murphy documented Keen's complaint and informed his management of it.

38.    DOL management assigned Murphy the IHC case on May 28, 2019.

39.    IHC had approximately 40 employees when Murphy began his investigation.

40.   Murphy scheduled a conference with Clark and Flick to go over their labor practices.  On June 4, 2019, Flick provided Murphy with IHC employee time sheets and pay statements.  Murphy made three observations.

41.   His first observation was that IHC did not pay its employees overtime from January 2018 to June 2019.

42.   Murphy's second observation was that not all of the time sheets contained the accurate number of total hours worked in a workweek.  Some sheets contained hours that were not actually worked.  IHC's reasoning was that at times employees would care for two clients at the same time (i.e., siblings).  The employee would then bill, for example, 8 hours for both of the clients.  The employee's time sheet for the day would say 16 hours when actually the employee only worked 8 hours.  This issue occurred only when the employee provided respite modifier service so the employee's time sheet for that day reflected the respite modifier code.  (JTE 1-14; 001B).

43.   Murphy's final observation was that some employees' pay statements contained different pay rates.  By way of example, on

joint exhibit 1-14; 002, an employee's bi-weekly statement said she worked 65 hours at a rate of $9.50 and 38 hours at a rate of $9.40. The difference in hourly rate was based on the service provided to the client.  Murphy observed that the statement contained the total number of hours worked (103) and the gross income for the two weeks ($974.70), but the statement did not include a single pay rate ($974.70 divided by 103).  (JTE 1-14; 002).

44.   Murphy also conducted confidential interviews of about four employees.  Three of them informed Murphy that they had asked Clark and Flick why they did not receive overtime pay.

45.   IHC employee, Robyn Tucker, testified that she began working at IHC in 2017 as a care giver.  She often worked more than 40 hours per week but never received overtime pay.

46.   In approximately May of 2017, three months after she began working at IHC, she asked Flick why she did not receive overtime pay.  Flick said that IHC is exempt from paying overtime since it is a companionship service provider.

47.   At the conclusion of his investigation, Murphy cited IHC for three FLSA violations – failing to pay overtime wages (29 U.S.C. § 207);

and two recordkeeping violations (29 C.F.R. 516.2(a)(6) and 29 C.F.R. 516.2(a)(7)).

## F. **Defendants Did Not Comply with the 2013 Rule**

48.    Prior to the 2013 Rule, Defendants claimed the exemption and paid their home care employees their flat rate for overtime hours worked.  (SF 27).  They continued this practice until approximately June 3, 2019, when the DOL investigation began.

49.    The employees listed at paragraph 15 were employees of IHC who provided companionship services to clients from January 23, 2018 through June 1, 2019.  (SF 18).

50.    Defendants failed to pay them overtime compensation from January 23, 2018 through June 1, 2019.  (SF 28).

51.    Defendants are obligated to pay their companionship service employees back wages for hours worked in excess of 40 per week between January 23, 2018 and June 1, 2019.  (SF 32).

52.    The total amount of back wages owed is $46,665.60.

## G. Defendants' Reasoning for Failing to Pay Overtime

53.  Defendants relied on the DOL representative's statements to Clark in 1998 or 1999 that companionship service providers were exempt from paying overtime wages.

54.  The DOL did not notify Defendants directly of the change in law.

55.  GHS notified IHC of changes in minimum wage laws but never notified them of a change in the FLSA overtime requirements.

56.  Flick asked GHS before the 2019 DOL investigation whether IHC would be reimbursed if it paid its staff more.  GHS informed Flick that it would not reimburse IHC at a higher rate.

57.  Clark attended health care education classes hosted by the State of Michigan to maintain her nursing license.  Neither the training classes nor the literature received in the classes mentioned a change in the FLSA overtime requirements.

58.  IHC pays a company to provide wage and hour posters and notices to post in the workplace.  The posters did not mention the change in the FLSA's overtime requirements.

## H. **Defendants Did Not Ascertain the FLSA Requirements**

59.    Defendants state in their interrogatory answers that they "have not taken any steps to assure compliance with the FLSA except, as described above, to pay for a legal service to provide labor law posters."  (JTE 1-4, Int. 11)

60.    Between January 1, 2015 and May 29, 2019, Defendants did not:

(a) consult with an attorney regarding compensation of their hourly employees.  (JTE 1-3, Admission 3).

(b) consult with an accountant regarding the compensation of their hourly employees.  (JTE 1-3, Admission 4).

(c) research the requirements of the FLSA.  (JTE 1-3, Admission 6)

(d) attend any trainings that covered how to compensate hourly employees in compliance with applicable labor laws.  (JTE 1-3, Admission 7).

(e) perform any research about how to compensate hourly employees in compliance with applicable labor laws.  (JTE 1-3, Admission 8).

61.    Clark had no contact with the DOL from 1998 or 1999 to June

2019.

### III.    CONCLUSIONS OF LAW

**A. General Requirements of the FLSA**

62.    The FLSA requires employers to compensate employees at

least minimum wage for all hours worked, and at the premium rate

of one and one-half times their base rate of pay for hours worked

over 40 in a week.   29 U.S.C. § 207(a)(1).   "Any employer who

violates the provisions of [section 207] of this title shall be liable to

the employee or employees affected in the amount of their unpaid

… overtime compensation … and an additional equal amount as

liquidated damages."  29 U.S.C. 216(b).

63.    Prior to 2013, employers who provided companionship services

were exempt from paying minimum wage and a premium rate for

overtime.   This changed on October 1, 2013, when DOL

promulgated the Home Care Final Rule which requires

companionship service employers to pay their employees minimum

wage and a premium rate for overtime.  This 2013 Rule went into

effect on January 1, 2015.

## B. **Defendants Owe Back Wages**

64.    IHC violated the FLSA overtime requirements by failing to pay its employees premium pay for overtime hours.  Defendants are required to pay back wages, totaling $46.665.60, to the affected employees.

## C. **Liquidated Damages**

65.    An award of liquidated damages is not intended to punish the employer for failing to pay overtime, but instead to compensate the employees for the delay in payment of wages owed under FLSA. *Elwell v. University Hospitals Home Care Services*, 276 F.3d 832, 840 (6th Cir. 2002); *see also Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697, 707, 65 S. Ct. 895, 902, 89 L.Ed. 1296 (1945).

66.    "The provisions of the statute are 'remedial and humanitarian in purpose,' and 'must not be interpreted or applied in a narrow, grudging manner.'"  *Monroe v. FTS USA, LLC,* 860 F.3d 389, 396 (6th Cir. 2017) (quoting *Coal, Iron & R. Co v. Muscoda Local No. 123*, 321 U.S. 590, 597, 64 S. Ct. 698, 88 L.Ed. 949 (1944)).

67.   An employer is subject to liquidated damages unless it can prove

that it acted in good faith and had reasonable grounds for believing

that its act or omission complied with the FLSA.  29 U.S.C. § 260.

68.   The burden is on the employer to make this showing and this

burden is "substantial."  *Elwell*, 276 F.3d at 840.

**Defendants fail to sustain their burden to show they acted in good faith**

69.   To show that it acted in good faith, the employer "'must show

that [it] took affirmative steps to ascertain the Act's requirements,

but nonetheless violated its provisions.'"  *Martin v. Ind. Mich. Power Co.*, 381 F.3d 574, 585 (6th Cir. 2004).

70.   As evidence of their good faith, Defendants rely on the actions

listed in paragraphs 53-58.

71.   The Court finds as a matter of law that these actions do not

demonstrate good faith.  Some do not illustrate action at all on the

part of Defendants.

72.   Good faith "requires that an employer first take active steps to

ascertain the dictates of the FLSA and then move to comply with

them."  *Reich v. S. New England Telecomm. Corp.*, 121 F.3d 58,

71 (2d Cir. 1997).  The Court interprets "active" and "affirmative

steps" to mean ongoing  and continual efforts taken to stay abreast with ever changing laws.  Defendants interpret the law to mean that affirmative steps must be taken at the time the employees are classified.  Defendants say Clark took such affirmative steps in 1998 or 1999, a year or two before she formed the company and classified the employees as exempt.  Defendants are wrong.

73.    IHC hired employees well after the company was formed.  An employee provided testimony who was hired as recently as 2017. Her classification would be on her hire date.  Defendants' argument that the affirmative steps must be taken at the time the employee is classified, is undermined by the fact that IHC did not take affirmative steps after it hired numerous employees since the classification of its first group of employees.

74.    The Defendants' argument is flawed and problematic.  Based on their interpretation, if an employer took affirmative steps 100 years ago to ascertain labor and employment laws at the company's formation, it would never have to check to see if those same laws from a century ago are still good law.  This cannot be so.

75.   Importantly, Defendants were not employers in 1998 or 1999 when Clark asked the DOL representative about the companionship exemption before IHC was even formed.  The law requires **employers** to take affirmative steps.  Clark was not an employer in 1998 or 1999.

76.   Defendants fail to sustain their burden to prove they took affirmative steps to ascertain the FLSA requirements.  Defendants cannot shift the burden to others to keep them apprised of the law.  It is their responsibility to stay up to date with the laws.  It is well settled that ignorance of the law does not demonstrate good faith. *Solis v. Min Fang Yang*, 345 Fed.Appx. 35, 39 (6th Cir. 2009) (holding "demonstrating good faith requires more than the absence of intent or knowledge."); *see also Williams v. Tri-County Growers, Inc*, 747 F.2d 121, 129 (3rd Cir. 1984).

## IHC's failure to pay overtime was not reasonable

77.   Since Defendants fail to demonstrate they acted in good faith, the Court need not decide whether they had reasonable grounds for believing they were not in violation of the FLSA, since 29 U.S.C.

19

§ 260 requires the employer to prove both prongs of the statutory provision. Nonetheless, the Court addresses reasonableness.

78.   Defendants' failure to check to see if the law changed over a twenty-year span was not reasonable. This omission is even more unreasonable based on the fact that at least three employees asked if they were entitled to overtime pay. A reasonable employer of employees who routinely work over 40 hours per week would inquire whether it is required to pay its employees overtime. The law does not state exactly when the employer must make this inquiry, but the Court finds failing to verify a law that impacts daily operations for twenty years is unreasonable.

79.   Defendants say the three employees merely asked Clark and Flick why they did not receive overtime; they did not tell Defendants there was a change in the law. Because of this, Defendants say the employees' questions would not trigger a reasonable employer to research the law. The Court finds no distinction here. An employee's question with respect to overtime pay would trigger a reasonable employer to research the law; especially if the employer has relied on the same law for twenty years.

80.   Defendants fail to sustain their burden to prove that not paying overtime was reasonable.

81.   There is a strong presumption in favor of awarding liquidated damages.   "Doubling is the norm, not the exception."   *Uphoff v. Elegant Bath, Ltd*, 176 F.3d 399, 405 (7th Cir. 1999); *see also Herman v. RSR Sec. Services Ltd.*, 172 F.3d 132, 142 (2d Cir. 1999)*; Chao v. Barbeque Ventures, LLC,* 547 F.3d 938, 942 (8th Cir. 2008); *Alvarez v. IBP, Inc.*, 339 F.3d 894, 910 (9th Cir. 2003); *Visner v. Michigan Steel Industries, Inc.*, No. 14-12786, 2015 WL 4488524 (E.D. Mich., July 23, 2015); *Ayala v. Tito Contractors, Inc.*, 82 F.Supp.3d 279, 285 (D.D.C. 2015) ("The presumption in favor of awarding liquidated damages is strong.").

82.   IHC owes its employees a total amount of $46,665.60 in back wages.  The Court awards $46.665.60 in liquidated damages.

## D. Defendants violated FLSA's record-keeping provisions

83.   The FLSA requires employers to keep accurate payroll records. 29 U.S.C. 211(c).  The regulations require the employer's payroll records to contain various information.  In relevant part, the payroll records must provide: (1) the employee's regular hourly rate of

pay per week pursuant to 29 C.F.R. 516.2(a)(6); and (2) an employee's total weekly hours of work pursuant to 29 C.F.R. § 516.2(a)(7).

84.    IHC employees' payroll summaries included multiple hourly rates if they provided multiple services, but it did not include a single rate (i.e., total pay divided by hours worked).  This omission violated 29 C.F.R. 516.2(a)(6)(i).

85.    Defendants are correct that their timesheets do include the hours worked each workday and each workweek.  However, the total hours on the timesheets that include respite modifier services are inaccurate.

86.    The purpose of the recordkeeping regulations is so that anyone, whether it is an employee or DOL investigator, can look at the records and easily determine how many hours the employee worked.  Knowledge of the respite modifier service is needed to break down how many hours an employee actually worked in a week.

87.    The Defendants violated 29 C.F.R. 516.2(a)(7).

## IV.   CONCLUSION

88.   For the period between January 23, 2018, through June 1, 2019, Defendants' failed to pay overtime to their employees in violation of 29 U.S.C. § 207.  Defendants are jointly and severally liable.  They must pay the employees listed in paragraph 15 $46,665.60 in unpaid wages.

89.   Defendants fail to meet their burden to show their failure to comply with the FLSA's overtime provisions was both in good faith and reasonable.  Defendants must also pay $46,665.60 in liquidated damages.  29 U.S.C. § 260.

90.   For the period between January 23, 2018 through June 1, 2019, Defendants violated the record-keeping requirements of 29 U.S.C. § 211(c) and the implementing regulations at 29 C.F.R. § 16.2.

91.   Defendants are enjoined from future violations of 29 U.S.C. § 207 and 29 U.S.C. § 211(c) and the implementing regulations at 29 C.F.R. § 516.2.

92.   Defendants are liable for costs, interest, and attorney fees.

93.    Parties to submit a proposed order of judgment by **May 27,**

**2022**.

**IT IS ORDERED.**

s/ Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated:  5/17/2022